**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE**

| | |
|---|---|
| RENTAL HOUSING ASSOCIATION; ELENA BRUK; SCOTT DOLFAY; CJD INVESTMENTS, LLC; ZELLA APARTMENTS, LLC, | No. 82469-4-I |
| Appellants, | ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |
| v. | |
| CITY OF SEATTLE, | |
| Respondents. | |

The respondent, City of Seattle, has filed a motion for reconsideration of the opinion filed in the above matter on March 21,2022. Appellant Rental Housing Association has filed a response to respondent's motion. The court has determined that respondent's motion for reconsideration should be denied, the opinion should be withdrawn and a substitute opinion filed.

Now, therefore, it is hereby

ORDERED that respondent's motion for reconsideration is denied. It is further

No. 82469-4-I/2

ORDERED that the opinion filed on March 21,2022, is withdrawn and a substitute opinion be filed.

Andrus, C.J.

Dwyer, J.

For the current opinion, go to https://www.lexisnexis.com/clientsidewareports/.

FILED
6/21/2022
Court of Appeals
Division I
State of Washington

THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| RENTAL HOUSING ASSOCIATION; ELENA BRUK; SCOTT DOLFAY; CJD INVESTMENTS, LLC; ZELLA APARTMENTS, LLC, | No. 82469-4-I |
| Appellants, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| CITY OF SEATTLE, | |
| Respondents. | |

ANDRUS, A.C.J. — In early 2020, the Seattle City Council passed three ordinances: one limiting a landlord's ability to evict a tenant for nonpayment of rent during three winter months, one prohibiting a landlord from evicting a tenant for nonpayment of rent for six months after the end of the COVID-19 civil emergency, and one requiring the landlord to accept installment payments of unpaid rent for a certain period of time after the end of the civil emergency. The Rental Housing Association of Washington (RHAWA) and several landlords challenge the constitutionality of these ordinances.

On summary judgment, the trial court concluded that a provision banning the accrual of interest on unpaid rent during the civil emergency and for one year

No. 82469-4-I/2

thereafter was preempted by state law. It upheld the remaining provisions of the three challenged ordinances.

We conclude that the ordinance prohibiting a landlord from evicting a tenant for nonpayment of rent for six months after the end of the civil emergency, without affording the landlord the opportunity to challenge a tenant's self-certification of a financial hardship, violates the landlord's right to procedural due process. We otherwise affirm.

FACTUAL BACKGROUND

In February 2020, the Seattle City Council enacted Ordinance 126041, now codified as SMC 22.205.080, precluding certain evictions during the winter months ("winter eviction ban"). The winter eviction ban provides:

[I]t is a defense to eviction if:

A. The eviction would result in the tenant having to vacate the housing unit at any time between December 1 and March 1; and

B. The tenant household is a moderate-income household as defined in Section 23.84A.016;[1] and

C. The housing unit that the tenant would have to vacate is owned by a person who owns more than four rental housing units in The City of Seattle. For purposes of this subsection 22.205.080.C, "owns" includes having an ownership interest in the housing units.

SMC 22.205.080(A)-(C). The stated goal of the ordinance is to "protect the public health, safety, and welfare by reducing the number of individuals and families

---

[1] SMC 23.84A.016 defines "[h]ousehold, moderate-income" as "a household whose income does not exceed median income." SMC 23.84A.025 defines "median income" as median family income for the area as determined by the U.S. Department of Housing and Urban Development (HUD). The Landlords presented evidence that under HUD regulations, the median family income in Seattle, Washington, in 2019 was $108,600.00 for a four-person household.

- 2 -

No. 82469-4-I/3

entering into homelessness during the wintertime" and to lower "the number of people at higher risk of developing exposure-related conditions."

In March 2020, the COVID-19 pandemic began. On March 14, 2020, Seattle's then Mayor Jenny Durkan issued an emergency order establishing a residential eviction moratorium, which the City Council amended by Resolution 31938 two days later. This moratorium remained uncodified and stated: "It shall be a defense to any eviction action that the eviction of the tenant will occur during the moratorium, unless the eviction action is due to actions by the tenant constituting an imminent threat to the health or safety of [others]." Mayor Durkan extended the emergency order and eviction moratorium to January 15, 2022.[2] After taking office in January 2022, the newly elected mayor, Bruce Harrell, extended the moratorium to February 14, 2022,[3] then again to February 28, 2022.[4]

On May 4, 2020, the City Council, recognizing that the "economic impacts from the COVID-19 emergency are likely to last much longer than the civil emergency itself," enacted Ordinance 126075, extending the eviction ban for an additional six months after the mayor lifts the eviction moratorium ("six-month eviction ban extension"). Ordinance 126075, codified as SMC 22.205.090, provides:

---

[2] City of Seattle, Office of the Mayor, Executive Order 2021-07, Executive-Order-2021-07-Continued-Extension-of-COVID-19-Closures-and-Relief-Policies.pdf (seattle.gov)
[3] City of Seattle, Office of the City Clerk, Executive Order 2022-01, http://clerk.seattle.gov/search/results?s6=executive+adj+order&l=200&Sect1=IMAGE&Sect2=THESON&Sect3=PLURON&Sect4=AND&Sect5=CFCF1&Sect6=HITOFF&d=CFCF&p=1&u=%2Fsearch%2Fclerk-files&r=3&f=G.
[4] City of Seattle, Office of the City Clerk, Executive Order 2022-03, http://clerk.seattle.gov/search/results?s6=executive+adj+order&l=200&Sect1=IMAGE&Sect2=THESON&Sect3=PLURON&Sect4=AND&Sect5=CFCF1&Sect6=HITOFF&d=CFCF&p=1&u=%2Fsearch%2Fclerk-files&r=1&f=G.

A.  Subject to the requirements of subsection 22.205.090.B, it is a defense to eviction if the eviction would result in the tenant having to vacate the housing unit within six months after the termination of the Mayor's eviction moratorium, and if the reason for terminating the tenancy is:

    1. The tenant fails to comply with a 14-day notice to pay rent or vacate pursuant to RCW 59.12.030(3) for rent due during, or within six months after the termination of, the Mayor's residential eviction moratorium; or

    2. The tenant habitually fails to pay rent resulting in four or more pay-or-vacate notices in a 12-month period . . . .

B.  The tenant may invoke the defense provided in subsection 22.205.090.A only if the tenant has submitted a declaration or self-certification asserting the tenant has suffered a financial hardship and is therefore unable to pay rent.

This defense took effect when the eviction moratorium terminated.

Then, on May 11, 2020, the City Council enacted Ordinance 126081, the "payment plan ordinance."[5]  It provides:

A.  A tenant who fails to pay rent when due during, or within six months after the termination of, the civil emergency proclaimed by Mayor Durkan on March 3, 2020, may elect to pay such overdue rent in installments. The tenant shall pay one month or less of overdue rent in three consecutive, equal monthly installments. The tenant shall pay over one month and up to two months of overdue rent in five consecutive, equal monthly payments. The tenant shall pay over two months of overdue rent in six consecutive, equal monthly payments. Any remainder from an uneven division of payments will be part of the last payment. The tenant may propose an alternative payment schedule, which, if the landlord agrees to it, shall be described in writing and signed by the tenant and landlord and deemed an amendment to any existing rental agreement.

B.  No late fee, interest, or other charge due to late payment of rent shall accrue during, or within one year after the termination of, the civil emergency proclaimed by Mayor Durkan on March 3, 2020.

---

[5] Ordinance 126081 has yet to be codified into the Seattle Municipal Code. The full text of the ordinance can be accessed here: http://clerk.seattle.gov/search/ordinances/126081.

- 4 -

. . . .

   E. Failure of the owner to accept payment under the installment
      schedule provided in subsection 2.A of this ordinance is a defense
      to eviction.

Ord. 126081 sec. 2. The City Council stated that the purpose of both the six-month eviction ban extension and this payment plan requirement is to reduce financial instability and the risk of homelessness among tenants in Seattle as a result of COVID-19.

In September 2020, RHAWA and several Seattle landlords brought suit challenging the constitutionality of these ordinances. On cross-motions for summary judgment, the trial court largely upheld the ordinances, but ruled that state law preempts the payment plan ordinance's ban on the accrual of interest on unpaid rent during and for a year after the civil emergency. The Landlords appealed and the City cross-appealed the invalidation of the interest accrual ban.

In June 2021, the City Council enacted another eviction-protection measure, Ordinance 126368–the civil-emergency defense–now codified as SMC 22.205.100. This ordinances provides:

SMC 22.205.100 provides:

A. Subject to the requirements of subsection 22.205.100.B, it is a
   defense to eviction if the tenant fails to pay rent due during the
   civil emergency proclaimed by Mayor Durkan on March 3, 2020,
   [that] the tenant has suffered a financial hardship during the civil
   emergency proclaimed by Mayor Durkan on March 3, 2020, and
   the reason for terminating the tenancy is:

      1. The tenant fails to comply with a 14-day notice to pay rent
         or vacate pursuant to RCW 59.12.030(3) for rent due
         during the civil emergency proclaimed by Mayor Durkan
         on March 3, 2020; or

No. 82469-4-I/6

> 2. The tenant habitually fails to pay rent resulting in four or more pay-or-vacate notices in a 12-month period . . . .
>
> B. The tenant may invoke the defense provided in subsection 22.205.100.A only if the tenant submits a declaration or self-certification asserting the tenant has suffered a financial hardship and was therefore unable to pay rent during the civil emergency proclaimed by Mayor Durkan on March 3, 2020.

This ordinance is similar to SMC 22.205.090, but not identical.  While both ordinances contain the requirement that tenants submit a declaration of financial hardship, SMC 22.205.100 additionally requires that the tenant establish that they actually suffered the alleged financial hardship, thus providing an opportunity for the landlord to dispute the application of the defense.  The Landlords do not challenge this eviction restriction.

ANALYSIS

We review a summary judgment order de novo and perform the same inquiry as the trial court.  Borton & Sons, Inc. v. Burbank Props., LLC, 196 Wn.2d 199, 205, 471 P.3d 871 (2020).  Constitutional questions are issues of law and are also reviewed de novo.  City of Redmond v. Moore, 151 Wn.2d 664, 668, 91 P.3d 875 (2004).

The Landlords present facial constitutional challenges to the ordinances.  In facial challenges, we consider only if the ordinances' language violates the constitution and not whether the ordinance would be constitutional "as applied" to the facts of a particular case.  JJR Inc. v. City of Seattle, 126 Wn.2d 1, 3-4, 891 P.2d 720 (1995).  We reject a facial claim "if there are any circumstances where the [challenged law] can constitutionally be applied."  Wash. State Republican

- 6 -

No. 82469-4-I/7

Party v. Wash. State Pub. Disclosure Comm'n, 141 Wn.2d 245, 282 n.14, 4 P.3d 808 (2000).

A. Preemption

The Landlords first argue that the ordinances conflict with and are therefore preempted by state law. The trial court ruled that state law only preempts the payment plan ordinance's ban on interest accruing on unpaid rent due during and within one year of the termination of the mayor's civil emergency proclamation. We agree with the trial court and conclude that the remaining provisions of the ordinances can be harmonized with state law.

> "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." Const. art. XI, sec. 11. "[A] state statute preempts an ordinance on the same subject if the statute occupies the field, leaving no room for concurrent jurisdiction, or if a conflict exists such that the statute and the ordinance may not be harmonized." Lawson v. City of Pasco, 168 Wn.2d 675, 679, 230 P.3d 1038 (2010). The Landlords here only argue conflict preemption, which "arises when an ordinance permits what state law forbids or forbids what state law permits." Id. at 682. An ordinance is constitutionally invalid if it "directly and irreconcilably conflicts with the statute." Brown v. City of Yakima, 116 Wn.2d 556, 561, 807 P.2d 353 (1991). "If the two may be harmonized, however, no conflict will be found." Lawson, 168 Wn.2d at 682. "[A] local ordinance may go further in its prohibition than state law." Rabon v. City of Seattle, 135 Wn.2d 278, 293, 957 P.2d 621 (1998).

1. Eviction Bans

The Landlords argue that the two eviction bans are preempted by provisions of the unlawful detainer statute, RCW 59.12.030(3); the Residential Landlord Tenant Act of 1973 (RLTA), RCW 59.18.130 and .650; and the ejectment statute, RCW 7.28.250, by prohibiting evictions that state law allows. Because the winter eviction ban and the six-month eviction ban extension do not prohibit any landlord

- 7 -

from evicting a tenant who has defaulted on rent, but merely regulates the timing of the eviction, we reject this argument.

RCW 59.18.130 requires that tenants shall pay rent "at such times and in such amounts as provided for in the rental agreement." RCW 59.12.030(3) provides that a tenant is liable for unlawful detainer if they continue in possession of rental property after a default in rent and after receiving adequate notice from the landlord. RCW 59.18.650(1)(a) and (2)(a) permits a landlord to evict a tenant for remaining in possession of the leased premises after a default in rent and the issuance of a written notice to pay or vacate under RCW 59.12.030(3). RCW 7.28.250 provides that where a tenant fails to pay rent, "the landlord has a subsisting right to reenter for such failure; he or she may bring an action to recover the possession of such property, and such action is equivalent to a demand of the rent and a reentry upon the property."[6]

The Landlords maintain that the winter eviction ban and the six-month eviction ban extension conflict with these statutory provisions by precluding them from obtaining a court order of eviction or ejectment after the nonpayment of rent. But our Supreme Court has held that state landlord/tenant laws do not preempt local ordinances that allow tenants to raise defenses to eviction in unlawful detainer proceedings.

---

[6] Both ejectment and unlawful detainer are legal methods of evicting tenants who do not pay their rent. Bar K Land Co. v. Webb, 72 Wn. App. 380, 383, 864 P.2d 435 (1993). Unlawful detainer actions under ch. 59.18 RCW are special statutory proceedings with the limited purpose of hastening the recovery of possession of rental property. Id. The superior court's jurisdiction is limited to the primary issue of possession and incidental issues such as restitution, rent, or damages. Id. Ejectment, however, is a remedy for someone who, having a claim of paramount title, is out of possession. Id. Counterclaims may be asserted in an ejectment action. Id.

No. 82469-4-I/9

In Kennedy v. City of Seattle, 94 Wn.2d 376, 617 P.2d 713 (1980), owners of two houseboat moorage sites challenged a Seattle ordinance limiting the right to evict houseboat occupants to six specified reasons. Id. at 379-80.[7] The landlords argued that the ordinance was preempted by the unlawful detainer statute and the RLTA because it placed limitations on their ability to evict tenants. Id. at 383-84. The court disagreed:

> There is no preemption expressly or by implication, nor is there an irreconcilable conflict between the statutes and the ordinance. A defendant in an unlawful detainer action may assert any defenses available. RCW 59.16.030; 59.18.380. The ordinance does not raise further procedural barriers between landlord and tenant but simply represents another defense for the tenant.

Id. at 384. Under Kennedy, a municipality may enact defenses to eviction without coming into conflict with the unlawful detainer statute or RLTA.

The Supreme Court extended the holding in Kennedy in Margola Assoc. v. City of Seattle, 121 Wn.2d 625, 652, 854 P.2d 23 (1993) (abrogated on other grounds by Yim v. City of Seattle, 194 Wn.2d 682, 703, 451 P.3d 694 (2019)). There, the court rejected a preemption challenge from landlords who argued that the RLTA preempted a Seattle ordinance prohibiting the eviction of tenants if the landlord failed to register the building as rental housing. Id. at 651. As in Kennedy, the court held that "[t]he registration ordinance likewise creates an additional

---

[7] These are: (1) failure to pay rent; (2) breach of covenant (excluding the obligation to surrender the site); (3) failure to abate a nuisance or causing a substantial damage to the moorage or substantially interfering with the comfort, safety or enjoyment of other floating home properties at the moorage; (4) failure to execute a lease not in excess of 5 years at a reasonable rent; (5) a change in use of the moorage (with several further restrictions) with 6 months' advance notice; and (6) if the moorage owner, with 6 months' notice, wishes to occupy the moorage site and finds the displaced houseboat owner another lawful moorage site within the City of Seattle. Id.

affirmative defense for a tenant" and is thus not preempted by state law.  Id. at 652.  This was the case despite the fact that the registration ordinance created a defense to eviction for any reason, including nonpayment of rent.  Id. at 632.

The Landlords distinguish Kennedy and Margola, arguing that in Kennedy, the ordinance specifically allowed for eviction based on the tenant's failure to pay rent.  94 Wn.2d at 379.  And in Margola, the Landlords argue, the defense to eviction was linked to the landlord's failure to comply with registration requirements, and not to the nonpayment of rent.  They further argue that under the RLTA, tenants may not exercise their rights to any remedies available under the RLTA unless they are current in the payment of rent.  RCW 59.18.080.  But RCW 59.18.080, by its language, applies only to a tenant's remedies under the RLTA, not to remedies or defenses arising from other laws or ordinances.  And the Landlord's efforts to distinguish Kennedy and Margola are unpersuasive.

First, neither the unlawful detainer statute nor the RLTA limits the defenses available to a tenant in an unlawful detainer action.  As in Kennedy, the ordinances here do not prevent landlords from filing unlawful detainer actions; each explicitly provides that they offer a new defense to such an action.  And the ordinance at issue in Margola allowed a tenant to raise as a defense to eviction the landlord's noncompliance with the registration ordinance, even when the unlawful detainer action was based on the nonpayment of rent.

Second, the ordinances do not remove a tenant's obligation to pay rent, prevent a landlord from bringing an unlawful detainer action, or eliminate a tenant's liability for their unlawful detainer under RCW 59.12.030(3).  Instead, they provide

- 10 -

a temporary defense to evictions, even where the tenant is in arrears, in certain limited circumstances. There is nothing in the unlawful detainer statute that requires that an eviction occur within any specific period of time. Under the winter ban, a landlord can file an unlawful detainer action, obtain an order finding the tenant to be in unlawful detainer status, and ask the court to schedule the issuance of a writ of restitution for execution after March 1. Under the COVID six-month eviction ban extension, the landlord could similarly initiate an unlawful detainer action at any time, obtain an order finding the tenant to be in arrears on rent and request the court to schedule the issuance of a writ of restitution after the six-month extension period expires.

Because the ordinances do not erect new procedural barriers to unlawful detainer but merely determine the timing of the issuance of writs of restitution, we conclude that the defenses to eviction provided in the ordinances do not irreconcilably conflict with state law.

2.    Payment Plan Ordinance

The Landlords next argue that the newly enacted state repayment plan statute, codified in RCW 59.18.630, conflicts with and preempts the payment plan requirement contained in Ordinance 126081. We conclude the Landlords' facial challenge fails because the city ordinance can be applied in a way to eliminate any conflict with the state statute.

In 2021, the state legislature enacted a payment plan structure for renters experiencing financial hardship due to COVID-19. RCW 59.18.630(2) provides:

> If a tenant has remaining unpaid rent that accrued between March 1, 2020, and six months following the expiration of the eviction

- 11 -

> moratorium or the end of the public health emergency, whichever is greater, the landlord <u>must</u> offer the tenant a reasonable schedule for repayment of the unpaid rent that <u>does not exceed</u> monthly payments equal to <u>one-third of the monthly rental charges</u> during the period of accrued debt. (Emphasis added.)

RCW 59.18.630(3) lists the requirements of such plans.[8] RCW 59.18.630(4) provides that "It is a defense to an eviction under RCW 59.12.030(3) that a landlord did not offer a repayment plan in conformity with this section."

The Landlords argue that the City's ordinance conflicts with state law because, while state law allows for a flexible payment schedule, the ordinance creates a mandatory fixed payment schedule based on the number of monthly rent payments the tenant has missed.

It is possible that a payment schedule under Ordinance 126081 could conflict with RCW 59.18.630's prohibition on payments exceeding one-third of monthly rental charges. For instance, if a tenant misses two months of rent at $2,000 per month, Seattle's ordinance would require the tenant to pay the $4,000 debt in five equal monthly payments of $800, which would exceed the permissible amount that a landlord could demand under state law. But the ordinance has a savings clause—it provides that the tenant may elect either to repay past rent on the schedule set out in the ordinance or to offer the landlord a different payment schedule. Ordinance 126081, § 2(A). "The tenant may propose an alternative payment schedule, which, if the landlord agrees to it, shall be described in writing

---

[8] The repayment plan may not require payment until 30 days after it is offered to the tenant; may not include any late fees, attorney fees or other charges; must allow for payment from any source of income, including churches or government agencies; and may not be conditioned on compliance with the rental agreement or a requirement that the tenant apply for government benefits. RCW 59.18.630(3)(a)-(d).

and signed by the tenant and landlord and deemed an amendment to any existing rental agreement." Id.

Because the tenant can choose between the state repayment law, capping the amount of the payments to one-third of the monthly rent, and the city's repayment ordinance, with the state law requiring lower monthly payments than the city ordinance, most tenants would foreseeably elect a payment plan consistent with state law.[9]  Although there could be a situation where the ordinance would require the tenant to make payments in excess of one-third of that tenant's monthly rent, and thereby violate state law, the ordinance's savings clause eliminates any conflict between the two.  Because there are circumstances where the payment plan ordinance can constitutionally be applied, the Landlords' facial challenge fails.

3.      Ban on Accrual of Interest

The Landlords next argue that RCW 19.52.010 preempts Ordinance 126081's ban on interest accruing on rent due during or within one year of the termination of the civil emergency proclamation.  We affirm the trial court's conclusion that the state statute preempts this ordinance provision.

Section 2(B) of Ordinance 126081 provides that "[n]o . . . interest . . . due to late payment of rent shall accrue during, or within one year after the termination of, the civil emergency."  But RCW 19.52.010(1) states "every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of twelve percent per annum where no different rate is agreed to in writing between the parties."  A

_____

[9] If the landlord offers a repayment plan consistent with state law, and the tenant refuses to consent to it, the landlord may evict that tenant.  RCW 59.18.630(2).  The tenant thus has a strong incentive to accept the payment plan required by state law.

- 13 -

party is entitled under this statute to prejudgment interest on any liquidated claim to compensate them for loss of use on money wrongfully withheld by another party. TJ Landco, LLC v. Harley C. Douglass, Inc., 186 Wn. App. 249, 256, 346 P.3d 777 (2015). When a party breaches an obligation to pay a specified amount, a new forbearance is created and that forbearance triggers the prejudgment interest statute. Id. Unpaid rent accrues interest at a default rate of 12 percent per annum when the parties' agreement does not provide otherwise. In re Estate of Wimberley, 186 Wn. App. 475, 511, 349 P.3d 11 (2015).

The ordinance prohibiting the accrual of prejudgment interest on unpaid rents violates the rights conferred on any creditor under RCW 19.52.010. There is no way of interpreting the provision banning the accrual of interest so that it does not conflict with RW 19.52.010. We therefore affirm the trial court's ruling that the interest provision in Ordinance 126081 is preempted by state law.

B. Takings Clause

The Landlords next challenge the ordinances as an unconstitutional taking without compensation in violation of article I, section 16 to the Washington Constitution.[10] They contend that the ordinances are a per se physical taking because they dispossess the Landlords of their right to occupy their own property.[11] We disagree that regulating the landlord-tenant relationship in this

---

[10] The takings clause of the Fifth Amendment to the United States Constitution provides, "nor shall private property be taken for public use, without just compensation." Similarly, article I, section 16 of the state constitution provides, "No private property shall be taken or damaged for public or private use without just compensation having been first made."
[11] The Landlords also argue that the ban on interest payments is also a taking. Because we affirm the trial court's conclusion that Ordinance 126081's ban on interest is preempted by state law, we need not reach this takings claim.

manner constitutes a per se physical taking of the leased premises.

Under the takings clause of the Fifth Amendment to the U.S. Constitution, when the government physically acquires private property for a public use, there is a clear and categorical obligation to provide the owner with just compensation. Cedar Point Nursery v. Hassid, __ U.S. __, 141 S. Ct. 2063, 2071, 210 L. Ed. 2d 369 (2021) (citing Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002)). Government action that physically appropriates property is no less a physical taking because it arises from a regulation. Id. at 2072. "The essential question is . . . whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." Id. Whenever a regulation results in a physical appropriation of property, a per se taking has occurred.[12] Id.

The Landlords argue that the Ordinances are per se takings because they eliminate the owner's right to exclude tenants from their property or to sue to collect past due rents. They rely heavily on the recent U.S. Supreme Court decision Cedar Point Nursery. There, plaintiffs challenged a California regulation that granted labor organizations the right to access an agricultural employer's property

---

[12] In Manufactured Housing Communities of Washington v. State, 142 Wn.2d 347, 361, 13 P.3d 183 (2000), abrogated by Chong Yim v. City of Seattle, 194 Wn.2d 651, 451 P.3d 675 (2019), the Supreme Court held that the Washington State Constitution is more protective than the federal constitution on the basis "that 'private use' under amended article I, section 16 is defined more literally than under the Fifth Amendment, and that Washington's interpretation of 'public use' has been more restrictive." In Yim, the Supreme Court held that it would nevertheless follow federal case law for evaluating whether a law constitutes a regulatory taking. 194 Wn.2d at 667. Now that the U.S. Supreme Court appears to apply the same test for both per se physical and regulatory takings, we assume our Supreme Court will continue to apply the federal test. We do so here.

- 15 -

to solicit support from workers for unionization. Id. at 2069-70. The court concluded that "[t]he access regulation appropriates a right to invade the growers' property and therefore constitutes a per se physical taking. The regulation grants union organizers a right to physically enter and occupy the growers' land for three hours per day, 120 days per year" and thus "the regulation appropriates for the enjoyment of third parties the owners' right to exclude." Id. at 2072.

The court deemed the California regulation analogous to an involuntary servitude or an easement, both of which rise to the level of takings requiring just compensation. Id. at 2073.

> The upshot of this line of precedent is that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation. As in those cases, the government here has appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, 120 days a year.

Id. at 2074. The Landlords maintain that the ordinances, like the invalid California regulation, are analogous to an involuntary occupation of their property by tenants whose right to remain was contingent on the payment of rent.

But there is a critical difference between tenants invited to live on a landlord's property in exchange for rent and union organizers with whom the landowners had no contractual relationship and who never had permission to enter the land in the first place. A tenant's right to occupy leased property may have originated in the contractual relationship between the landlord and the tenant, but the tenants' rights, including the right to occupy, are heavily regulated in Washington and protected by state statutes. This is not a situation in which a government has unilaterally authorized someone with no connection to the

property to gain access, but one in which the landlord has voluntarily given a temporary right of occupancy through contract and the government has altered its regulation of that contractual relationship in favor of the tenants. The U.S. Supreme Court has previously held that "statutes regulating the economic relations of landlords and tenants are not per se takings." F.C.C. v. Florida Power Corp., 480 U.S. 245, 252, 107 S. Ct. 1107, 94 L. Ed. 2d 282 (1987) (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)).

More applicable to the present case is the U.S. Supreme Court's decision in Yee v. City of Escondido, 503 U.S. 519, 112 S. Ct. 1522, 118 L. Ed. 2d 1 (1992). There, mobile home park owners challenged a California law limiting the reasons that a park owner could terminate a mobile home owner's tenancy and a municipal ordinance prohibiting an increase in rent without city council approval. Id. at 524-25. The park owners argued that the rent control provision constituted a per se physical taking. Id. at 523-24. The Court rejected this argument, reasoning that a physical taking occurs "only where [the government] requires the landowner to submit to the physical occupation of his land" and because the laws merely regulated petitioners' use of their land by regulating the relationship between landlord and tenant, they could not be squared with the Court's physical takings cases. Id. at 527-28. This case is more analogous to Yee than to Cedar Point Nursery. The Landlords voluntarily invited the tenants to live in their homes and the ordinances regulate a landlord-tenant relationship that has already been established by the parties.

No. 82469-4-I/18

The Landlords argue that the reasoning in Yee should not be extended to this case because the regulation at issue in that case simply prohibited rent increases, whereas here, Seattle's winter and COVID-19 eviction bans preclude them from terminating a tenancy for nonpayment of rent.

We understand that the reasoning in Yee was premised on the fact that the applicable rent control laws did not affect the landlords' right to exclude anyone from their property:

> At least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so. . . . While the "right to exclude" is doubtless, as petitioners assert, "one of the most essential sticks in the bundle of rights that are commonly characterized as property," we do not find that right to have been taken from petitioners on the mere face of the Escondido ordinance.

Id. at 528-29 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979)).  Similarly, in Margola, our Supreme Court held that restricting a landlord's ability to evict a tenant based on the landlord's nonpayment of a registration fee was not a taking because, as in Yee, the law did not destroy the landlord's right to exclude others from their property.  121 Wn.2d at 648.  It specifically quoted the following passage from Yee:

> A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.

121 Wn.2d at 648 (emphasis in original) (quoting Yee, 503 U.S. at 528).  This language in Yee, adopted in Margola, appears to create an exception—if the ordinance compelled a landlord to rent to someone over the landlord's objection, or prohibited the landlord from ever terminating the tenancy, a takings claim would

- 18 -

No. 82469-4-I/19

arise.

We nevertheless conclude that the ordinances do not fit into the exception carved out by Yee and Margola.  First, the ordinances do not require a landlord to rent property to anyone with whom the landlord has not already voluntarily entered into a lease agreement.  Second, the ordinances do not prevent a landlord from ever terminating a tenancy.  The ordinances place timing restrictions on eviction, but otherwise do not change a pre-existing landlord-tenant relationship.[13]

Several federal district courts have considered and rejected a takings claim in the context of various COVID-related eviction moratoria.  In El Papel LLC v. Durkan, 2021 WL 4272323 (W.D. Wash. September 15, 2021), a magistrate judge addressed a challenge to two of the same ordinances at issue here—the six-month eviction ban extension and the payment plan requirement—and concluded the ordinances do not amount to a physical taking under Yee.  Id. at *15-16.  Magistrate Judge Creatura reasoned:

> Here, too, the government has not required a physical invasion of plaintiffs' property. Instead, plaintiffs have voluntarily rented their land to residential tenants and temporarily lost the ability to evict tenants in certain situations during the COVID-19 crisis and for six months after September 30, 2021. Contrary to plaintiffs' arguments, none of the restrictions are permanent. Plaintiffs retained the ability to sue their tenants for unpaid rent due to COVID-19 under the State moratorium, except where the resident had not been offered or was complying with a repayment plan.  The City allows tenants to take advantage of a repayment plan, but neither the City nor the State has forgiven or cancelled unpaid rent.

Id. at *16.

---

[13] Employing the same analysis, Division Two of this court recently held that the state COVID-19 eviction moratorium did not constitute a per se physical taking under Yee.  Gonzales v. Inslee, No. 55915-3-II, slip op. at *23 (Wash. Ct. App. Feb. 23, 2022) https://www.courts.wa.gov/opinions/pdf/D2%2055915-3-II%20Published%20Opinion.pdf.

- 19 -

No. 82469-4-I/20

In Elmsford Apt. Assocs., LLC v. Cuomo, residential landlords challenged Governor Cuomo's executive order that temporarily allowed tenants to apply security deposits toward rent and temporarily prohibited landlords from initiating evictions of tenants facing pandemic-caused financial hardships. 469 F. Supp. 3d 148, 160 (S.D. N.Y. 2020). The federal district court held that a "temporary halt on evictions" does not take on the character of a physical taking. Id. at 163. The landlords continued to control their property, continued to rent to tenants and to collect rents from them; the order did not reduce the amount the tenants had to pay, or forgive any rental obligations. The landlords retained the right to evict tenants when the order expired. Thus, it held that a temporary ability to expel tenants facing COVID-related financial setbacks did not rise to the level of a physical taking. Id. at 164.

Similarly, in Auracle Homes, LLC v. Lamont, residential landlords sued the Governor of Connecticut, alleging that his executive orders limiting evictions and rent payments during the pandemic violated the takings clause. 478 F. Supp. 3d 199, 218 (D. Conn. 2020). A federal district court there followed the reasoning of Elmsford and concluded that no physical taking had occurred because the landlords had voluntarily rented their premises to the tenants and regulations affecting the economic relationships between landlords and tenants are not a physical invasion. Id. at 220-21. Other federal courts addressing COVID-related restrictions on eviction have held the same. See Heights Apartments, LLC v. Walz, 510 F. Supp. 3d 789, 812 (D. Minn. 2020); Baptiste v. Kennealy, 490 F. Supp. 3d 353, 388 (D. Mass. 2020).

- 20 -

No. 82469-4-I/21

Finally, in Jevons v. Inslee, 2021 WL 4443084 (E.D. Wash. 2021), the court rejected a taking challenge to Governor Inslee's COVID-19 eviction moratorium. The court held that the moratorium "did not require Plaintiffs to submit to a physical occupation or invasion of their land and did not appropriate Plaintiffs' right to exclude." Id. at *13. "No physical invasion has occurred beyond that agreed to by Plaintiffs in renting their properties as residential homes, which is naturally subject to regulation by the state." Id.

The reasoning contained in these federal cases is persuasive. Neither the winter eviction ban nor the COVID-eviction ban extension takes away any control over the property from landlords. They may continue to rent their properties and to collect rents. The ordinances do not forgive any rent obligations owed by tenants or reduce the amount the tenants must pay in arrearages. And the landlords retain the right to evict tenants at the end of the winter or six months after the expiration of the COVID civil emergency. We conclude that neither eviction ban constitutes a per se physical taking in violation of article 1, section 16 of the Washington Constitution.

C. Procedural Due Process

The Landlords argue that each ordinance violates their procedural due process right to a meaningful opportunity to be heard before they are deprived of their property rights. We agree as to the six-month eviction ban extension's self-certification provision, but otherwise affirm the trial court.

Article I, section 3 of the Washington Constitution states: "No person shall be deprived of life, liberty, or property, without due process of law." Our state due

- 21 -

No. 82469-4-I/22

process protection against the arbitrary exercise of the powers of government has both procedural and substantive components. Yim, 194 Wn.2d at 688. "The procedural component provides that '[w]hen a state seeks to deprive a person of a protected interest', the person must 'receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation.' " Id. (quoting Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 216, 143 P.3d 571 (2006). A procedural due process claim has two distinct elements: (1) the deprivation of a constitutionally protected liberty or property interest; and (2) a denial of adequate procedural protections. Webb v. Washington State University, 15 Wn. App. 2d 505, 516, 475 P.3d 1051 (2020).[14]

### 1.  Deprivation of Constitutionally-Protected Property Interests

To meet their burden, the Landlords must first demonstrate that the ordinances constitute a deprivation of a constitutionally-protected property interest. Mathews v. Eldridge, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); Bang Nguyen v. Dep't of Health Med. Quality Assur. Comm'n, 144 Wn.2d 516, 522-23, 29 P.3d 689 (2001).

The Landlords identify the property interests at issue here as:

(1) timely paid rent money, which right is protected by State law . . ., (2) deprivation of the eviction mechanism established by law to assist in either enforcing timely paid rent or enforcing a timely return of the rental premises to the owner . . . , (3) forcing landlords to suffer involuntary physical occupation of an owned real property space, and (4) deprivation of State law required interest on a current owed debt.

---

[14] Article I, section three provides protections coextensive to those contained in the U.S. Constitution's 14th Amendment. State v. Jordan, 180 Wn.2d 456, 462, 325 P.3d 181 (2014). As such, federal cases must be given great weight in construing the state due process provision. Petstel, Inc. v. King County, 77 Wn.2d 144, 153, 459 P.2d 937 (1969).

No. 82469-4-I/23

The U.S. Supreme Court has recognized that property owners have a constitutionally protected right to exclude others from their property. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 673, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999) ("The hallmark of a protected property interest is the right to exclude others. That is one of the most essential sticks in the bundle of rights that are commonly characterized as property.") (quoting Kaiser Aetna, 44 U.S. 164 at 176). Our court has similarly recognized that the right to exclude others from one's property is a fundamental attribute of property ownership. See Holmquist v. King County, 192 Wn. App. 551, 561-62, 388 P.3d 234 (2016) ("Respecting the paramount right to exclude others, Washington courts compensate the loss of exclusive possession under a variety of legal theories.").

The U.S. Supreme Court also considers rental income to be a significant property interest in the due process context. See U.S. v. James Daniel Good Real Prop., 510 U.S. 43, 54-55, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993) (federal government required to give landowner notice and hearing before seizing home and ordering tenants to remit rent to the U.S. Marshal).

In the landlord-tenant relationship, both rights are recognized in RCW 59.12.030(3) and RCW 7.28.250. These statutes provide that Washington landlords are entitled to the timely payment of rent and confer on them the right to file an action for unlawful detainer and to reenter the property upon a default in payment. We thus conclude the Landlords have established that they have constitutionally protected property rights impacted by the ordinances.

- 23 -

No. 82469-4-I/24

The City contends that even if the Landlords have constitutionally protected property rights, the eviction defenses do not "deprive" the Landlords of this property because the eviction bans are temporary in nature. But the Landlords' property interests are protected under procedural due process even if the challenged deprivation is temporary. In Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 338-39, 89 S. Ct. 1820, 23 L. Ed. 2d. 349 (1969), the Court held that a Wisconsin garnishment statute, allowing for prejudgment garnishment of wages, violated due process principles even if the deprivation of income was temporary because "in the interim the wage earner is deprived of his enjoyment of earned wages without any opportunity to be heard and to tender any defense he may have." In a concurring opinion, Justice Harlan clarified that "[t]he 'property' of which petitioner has been deprived is the use of the garnished portion of her wages during the interim period between the garnishment and the culmination of the main suit." Id. at 342 (J. Harlan, concurring). See also, Fuentes v. Shevin, 407 U.S. 67, 84-85, 92 S. Ct. 1983, 32 L. Ed. 2d. 556 (1972) ("it is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment); Olympic Forest Prods., Inc. v. Chaussee Corp., 82 Wn.2d 418, 419, 511 P.2d 1002 (1973) (prejudgment garnishment of $30,000 was deprivation of significant property interest).

The winter eviction ban temporarily deprives the Landlords of their right to exclude nonpaying tenants and to receive rental income by barring the Landlords from removing these tenants and from renting the property to someone who can pay. The six-month eviction ban extension similarly deprives the Landlords of

- 24 -

No. 82469-4-I/25

these same property rights for six months after the expiration of the civil emergency. Although the Landlords are only temporarily barred from evicting nonpaying tenants, the winter eviction ban and six-month eviction ban extension nevertheless effectuate a deprivation of significant property rights. Even if a landlord is eventually able to evict the nonpaying tenant and obtain a judgment for unpaid rent, the landlord lost the use of the rental income during the interim period.[15]

The City argues that the holdings in Sniadach, Fuentes, and Olympic Forest, should be limited to the prejudgment seizure of a defendant's assets. But, in Olympic Forest, the Supreme Court explicitly rejected the argument that the due process clause applies to certain types of property and not others:

> [T]he basic due process requirements of notice and a prior hearing are not limited to the protection of only certain types of property, for if the root principle of procedural due process is to be applied with objectivity, it cannot rest on such distinctions. . . . Where any 'significant property interest' is at stake, the safeguards of procedural due process are applicable.

82 Wn.2d at 428 (quoting Fuentes at 90).

Moreover, the temporary deprivation of access to one's real estate in the landlord-tenant context is a significant one. The purpose of an unlawful detainer action is to provide "an expedited method of resolving the right to possession of property." Christensen v. Ellsworth, 162 Wn.2d 365, 370-71, 173 P.3d 228 (2007). This statute recognizes that a tenant who cannot pay rent may be judgment proof

---

[15] The Landlords also argue that Ordinance 126081 deprives them of their property interest in interest accruing on owed rent. We need not reach the issue because we conclude the ban on the accrual of interest is preempted by state law.

- 25 -

and expediting the tenant's departure allows the landlord to recover possession of the property before incurring extensive damages. Without the ability to exercise their rights under the RLTA and unlawful detainer statutes, the Landlords face the risk of never being able to recover the unpaid rent, even after they are eventually able to evict the defaulting tenant.[16]

2.      Adequacy of Procedural Protections

The Landlords argue that none of the ordinances contain adequate safeguards to protect against the wrongful deprivation of their property interests. We conclude that the winter eviction ban and the payment plan ordinance provide the Landlords with adequate procedural protections to safeguard their identified property interests, but the COVID six-month eviction ban extension does not.

When determining procedural due process rights, we use the balancing test of Mathews v. Eldridge:

> [C]ourts must balance three factors to determine the process due in a particular situation: (1) the private interest that will be affected by the governmental action, (2) the risk of erroneous deprivation and the probable value of requiring additional procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens that additional procedural safeguards would entail.

City of Redmond v. Moore, 151 Wn.2d 664, 681, 91 P.3d 875 (2004) (citing Mathews, 424 U.S. at 335).

The private interests implicated by each ordinance are the deprivation of

---

[16] In Auracle Homes, the federal district court rejected the landlords' procedural due process challenge to the Connecticut eviction moratorium because of Second Circuit precedent precluding a party from pursuing a due process claim if the property interest at issue is arguably protected by the takings clause. 478 F. Supp. 3d at 227. In Washington, however, courts recognize no such rule and permit the simultaneous prosecution of due process and takings claims. See Guimont v. City of Seattle, 77 Wn. App. 74, 80, 896 P.2d 70 (1995).

rental income. In <u>James Daniel Good Real Property</u>, the Supreme Court concluded that a loss of $900 in rent per month due to government seizure of claimant Good's residential property "represents a significant portion of the exploitable economic value of Good's home" and therefore "the private interests at stake in the seizure of real property weigh heavily in the <u>Mathews</u> balance." 510 U.S. 43, 54-55. The government interest is allowing tenants to avoid homelessness during the winter or during an unprecedented event, when the health risks of being unsheltered are extremely high. Both interests are compelling.

The question here is whether the procedures set out in the ordinances are adequate to minimize the risk that landlords will lose rental income unnecessarily and whether providing additional safeguards to avoid such risks would impair the government's interest in reducing homelessness.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " <u>Mathews</u>, 424 U.S. at 333 (quoting <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)). Absent "extraordinary circumstances," "[t]he right to prior notice and a hearing is central to the Constitution's command of due process." <u>James Daniel Good Real Property</u>, 510 U.S. at 53. Procedural due process "[a]t its core is a right to be meaningfully heard, but its minimum requirements depend on what is fair in a particular context." <u>In re Det. of Stout</u>, 159 Wn.2d 357, 370, 150 P.3d 86 (2007).

The ordinances create defenses to an action for unlawful detainer. A landlord may not evict anyone without a court order. RCW 59.18.290(1). To obtain

No. 82469-4-I/28

a court order, the landlord must file a complaint for unlawful detainer and request a hearing. RCW 59.18.370. At the hearing, the tenant may assert any defense arising out of the tenancy. RCW 59.18.380. The two eviction ban ordinances set out different conditions that the tenant must meet before a court can delay the eviction. Because the fairness of any set of procedures is contextual in nature, we evaluate each of the ordinances separately.

a. Winter Eviction Ban

To prevail on a winter eviction ban defense, a tenant must prove that (1) the eviction would require the tenant to vacate between December 1 and March 1, (2) the tenant household is "a moderate-income household as defined in [SMC] 23.84A.016," and (3) the tenants live in housing units "owned by a person who owns more than four rental housing units" within Seattle. SMC 22.205.080(A)-(C). Any tenant seeking to avoid eviction between December 1 and March 1 must make this factual showing at or before the show cause hearing.

The Landlords contend that the winter eviction ban creates an unreasonable risk of an erroneous deprivation of their property rights because it does not require the tenant to prove the existence of a financial hardship or a risk of homelessness. But the tenant must establish their household income fails to meet a designated threshold, a proxy for financial hardship. SMC 23.84A.016 defines "Household, moderate-income" as "a household whose income does not exceed median income." SMC 84A.025 defines "median income" as

> annual median family income for the Seattle area, as published
> from time to time by the U.S. Department of Housing and Urban
> Development (HUD), with adjustments according to household size
> in a manner determined by the Director, which adjustments shall be

- 28 -

based upon a method used by the United States Department of Housing and Urban Development to adjust income limits for subsidized housing, and which adjustments for purposes of determining affordability of rents or sale prices shall be based on the average size of household considered to correspond to the size of the housing unit (one (1) person for studio units and one and a half (1.5) persons per bedroom for other units).

HUD sets income limits that determine eligibility for assisted housing programs and develops income limits for each metropolitan area, parts of some metropolitan areas, and each non-metropolitan county.[17] The Landlords presented evidence below that the annual median family income for Seattle in 2019 was $108,600. According to its website, HUD has set the 2021 income level at $115,700.[18]

The Landlords argue that it is unfair to permit someone earning $115,700 to remain rent free in their apartments or homes for three months if these individuals cannot prove that they in fact face homelessness. But the City offered evidence of a connection between eviction and the risk of homelessness, citing the "Losing Home" report, published by the Seattle Women's Commission and King County Bar Association's Housing Justice Project in 2018.[19] The report found that 37.5 percent of people evicted in King County became unsheltered, another 25 percent live in a shelter or transitional housing, and another 25 percent ended up staying with family or friends. Only 12.5 percent of evicted respondents found

---

[17] Income Limits, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, https://www.huduser.gov/portal/datasets/il.html#2021_query.

[18] Fiscal Year 2022 Income Limits Documentation System, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, https://www.huduser.gov/portal/datasets/il/il2021/2021MedCalc.odn (medial income calculation), https://www.huduser.gov/portal/datasets/il/il12/HUD_sec8_12.pdf (family size uses four as a base).

[19] Seattle Women's Comm'n & King Cty. Bar Ass'n Housing Justice Project, LOSING HOME: THE HUMAN COST OF EVICTION IN SEATTLE, at 3 (2018) http://www.seattle.gov/Documents/Departments/SeattleWomensCommission/LosingHome_9-18-18.pdf (hereafter "LOSING HOME").

another apartment or home. The City Council cited these statistics as a part of its legislative findings supporting the winter eviction ban. Given these statistics, it is highly unlikely that a significant number of individuals facing eviction in the winter months actually earn a six-figure income.

The Landlords argue that requiring tenants to demonstrate a financial hardship or an increased risk of homelessness as a precondition to invoking the winter eviction ban defense would protect the Landlords' right to evict a defaulting tenant who is not at risk of becoming homeless. But this policy argument would require us to make a substantive change in the law, rather than to add more procedural protections.

In Fields v. Department of Early Learning, 193 Wn.2d 36, 43-45, 434 P.3d 999 (2019), four justices of the Supreme Court held that an employee of a licensed daycare facility had a procedural due process right to challenge a permanent administrative disqualification from providing licensed child care based on a 30-year-old robbery conviction. But five justices disagreed that the Department of Early Learning disqualification rule violated the employee's procedural due process rights, with Justice Gordon McCloud concurring in the lead opinion's result but doing so on substantive due process grounds. See Id. at 52-53 (McCloud, J., concurring); Id. at 58 (Fairhurst, J., dissenting) (procedural due process guarantees only that individuals have notice and the opportunity to contest whether the rule applies to them, not whether it should do so). The Landlords' argument here is more akin to a substantive, rather than procedural, due process claim. Yet, the Landlords raise only procedural due process in their briefs.

No. 82469-4-I/31

The minimum procedural due process requirements are:

(1) timely and adequate notice of hearing on the probable validity of the . . . claim which states the basis for the claim and allows the [responding party] adequate time to prepare for the hearing; (2) an independent and impartial decision maker; (3) the right to appear personally at the hearing, with or without retained counsel; (4) the right at the hearing to confront and cross-examine any adverse witness and to present evidence and oral argument in support of his claim or defense; (5) the right to a decision based on applicable legal rules and evidence adduced at the hearing.

Rogowski v. Hammond, 9 Wn. App. 500, 506, 513 P.2d 285 (1973).

Under SMC 22.205.080(E)(2) and the unlawful detainer statute, the Landlords have the right to a hearing to challenge the factual veracity of the tenant's claimed income level. Nothing prevents the landlord from claiming that a tenant has the ability to pay rent and has simply chosen not to do so. The winter eviction ban ordinance satisfies the requirements of procedural due process.

Moreover, the risk of erroneous deprivation is low given that, even where the court deems the defense applicable, the deprivation of rental income and the landlord's ability to evict defaulting tenants is temporary, lasting no more than three months, after which the landlord may proceed with eviction and seek recovery of unpaid rent. The winter eviction ban does not violate procedural due process.

b.     Six-Month COVID Eviction Ban Extension

The Landlords argue that even if the winter eviction defense includes sufficient procedural safeguards to satisfy due process, the six-month eviction ban extension does not. We agree.

SMC 22.205.090(B) allows any tenant, regardless of employment status or income level, to invoke the six-month eviction ban extension by simply submitting

- 31 -

a "self-certification" asserting that the tenant has suffered a financial hardship and is unable to pay rent. While SMC 22.205.100, the civil emergency defense, requires the tenant to actually prove the existence of a financial hardship, SMC 22.205.090 contains no such proof requirement. The self-certification provision does not allow a landlord to challenge the veracity of the tenant's certification. Once a tenant submits a declaration of financial hardship, there appears to be no basis on which the landlord may challenge it.[20]

The U.S. Supreme Court recently ruled that a similar New York law violates due process. Chrysafis v. Marks, No. 21A8, 594 U.S. __, 2021 WL 3560766 (Aug. 12, 2021). The New York law at issue in Chrysafis offered more procedural protections than the six month eviction extension does in that it required a tenant to submit a "self-certification" of financial hardship under penalty of perjury. Id. at *1. The court held that "[t]his scheme violates the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause" and indicated that due process would not be satisfied without a hearing to allow the landlord to challenge the claim of financial hardship. Id. (quoting In re Murchson, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955)). We reach the same conclusion here; under basic due process law, the Landlords must have an opportunity to challenge the veracity of the tenant's self-certification or declaration of financial hardship.

---

[20] Counsel for the City stated at oral argument that a landlord may not challenge the veracity of a tenant's self-certification. See Court of Appeals Division 1 Oral Argument recording at 14:40-15:18 (January 25, 2022).

The City has advanced no argument for why such an additional procedural protection would be unduly burdensome. SMC 22.205.100, which provided a defense to evictions during the civil emergency, applies only where "the tenant has suffered a financial hardship during the civil emergency" and thus requires the tenant to prove a financial hardship, presumably with evidence the landlord has the opportunity to challenge. By neglecting to include this evidentiary requirement from SMC 22.205.090, the City Council has eliminated the Landlords' ability to meaningfully contest the tenant's assertion of financial hardship.

The inability to challenge the tenant's self-certification creates the unnecessary risk that a court will grant a reprieve from eviction to a tenant who does not financially need it. The City has failed to demonstrate how the addition of procedural protections that would safeguard against such an erroneous deprivation would cause an undue burden and outweighs the benefits the protections offer. The six month eviction ban extension thus violates the Landlords' right to procedural due process.

c.      Payment Plan Ordinance

The Landlords argue that the payment plan requirement is defective because it requires no showing of a heightened risk of homelessness on the part of the tenant. But again, the Landlords are confusing procedural protections with substantive ones. The payment plan defense is not based on a self-certification by the tenant. The ordinance requires a court to determine whether, in fact, the tenant proffered and the landlord refused to accept a tenant's installment payment under the ordinance's mandated schedule. The landlord is free to appear at the

show cause hearing and argue that they did in fact accept the payment, or show that the tenant failed to tender the required installment payment. The law does not deprive the Landlords of the minimum procedural protections afforded under Rogowski. This procedure satisfies due process requirements.

D. Privileges and Immunities

Finally, the Landlords argue that the ordinances violate Washington's privileges and immunities clause by favoring the rights of Seattle tenants over those of Seattle landlords. We reject this argument because the ordinances do not implicate fundamental rights under the privileges and immunities clause.

Article I, section 12 of the Washington Constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

Washington courts employ a two-part test to decide if legislation violates article I, section 12, asking first whether the challenged law grants a "privilege" or "immunity" for purposes of the state constitution, and, if it does, then asking if there is a reasonable ground for granting the privilege or immunity. Schroeder v. Weighall, 179 Wn.2d 566, 572-73, 316 P.3d 482 (2014) (citations omitted).

"Not every benefit constitutes a 'privilege' or 'immunity' for purposes of the independent article I, section 12 analysis. Rather, the benefits triggering that analysis are only those implicating " 'fundamental rights . . . of . . . state . . . citizenship.' " Id. at 573 (quoting State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902)). In Schroeder, the Supreme Court recognized that "where a cause of

action derives from the common law, the ability to pursue it is a privilege of state citizenship triggering article I, section 12's reasonable ground analysis. A law limiting the pursuit of common law claims against certain defendants therefore grants those defendants an article I, section 12 'immunity.' " Id. However, rights left to the discretion of the legislature are not generally considered fundamental. Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc., 196 Wn.2d 506, 519, 475 P.3d 164 (2020).

The Landlords reference a few rights they claim to be fundamental in the privileges and immunities context: the right to pursue a claim in court, the right to conduct rental business, the right to hold and enjoy one's own property, and the right to collect debts. But the process for eviction, and the respective rights of tenants and landlords, have been left to the discretion of the legislature. Under these circumstances, we doubt that the ordinances implicate privileges and immunities concerns.

"An unlawful detainer action is a statutorily created proceeding that provides an expedited method of resolving the right to possession of property." Christensen, 162 Wn.2d at 370-71. The definition of unlawful detainer, the procedural requirements to initiate such an action, and even the petitioner's burden at trial are specifically set out in chapter 59.12 RCW. The RLTA goes even further and lays out the respective duties and rights of tenants and landlords, and their available remedies. The ordinances do not prevent the Landlords from pursuing an unlawful detainer or common law action against a defaulting tenant, nor do they prevent the Landlords from acquiring or holding property; they regulate the use of

property which the Landlords voluntarily chose to subject to residential leases under the above acts. What the Landlords actually seek is the ability to quickly evict a tenant following the tenant's default, notwithstanding seasonal or pandemic-related considerations. They cite no authority for the proposition that they have a fundamental right under article I, section 12.

But even if the ordinances did implicate a fundamental right, the City has adequately shown there is a reasonable ground for granting the privilege or immunity. Under the reasonable grounds test, a court will not hypothesize facts to justify a legislative distinction. Schroeder, 179 Wn.2d at 574 (citing City of Seattle v. Rogers, 6 Wn.2d 31, 37-38, 106 P.2d 598 (1940)). Rather, the court will scrutinize the legislative distinction to determine whether it in fact serves the legislature's stated goal. Id. The ordinances must be justified in fact and theory. Martinez-Cuevas, 196 Wn.2d at 523.

We conclude that the ordinances serve their stated goals and thus meet the reasonable ground standard. The purpose of the winter ban is to "reduc[e] the number of individuals and families entering into homelessness during the wintertime." Ordinance 126041 at 2. The "Losing Home" report indicates that a substantial proportion of evicted tenants become homeless. LOSING HOME at 3. The City Council noted that in 2018, the King County Medical Examiner's Office investigated the deaths of 194 individuals presumed to be homeless. It also noted that people experiencing homelessness have a much higher risk than the general population of developing exposure-related conditions. By prohibiting evictions during winter months, the City Council seeks to lower the number of people who

die of or sustain physical injuries associated with being exposed to winter weather. The winter eviction ban reasonably meets the ordinance's goal of preventing homelessness at a time when living unsheltered would cause the most physical harm.

The purpose of the six-month eviction ban extension is to reduce the economic impacts and risk of homelessness among tenants in the immediate aftermath of the COVID-19 pandemic. Ordinance 126075 at 1-2. The repayment plan requirement shares the same goals. Ordinance 126081 at 1-2. These goals are also met by providing a defense to eviction and reducing the burden of rental payments on Seattle tenants.

The Landlords argue that the ordinances lack reasonable grounds because they are over-inclusive and are not limited to low-income renters at most risk of homelessness. But the reasonable grounds test includes no such narrow-tailoring requirement. They merely need to further the legislative body's stated goals. Each ordinance meets this requirement and thus survives the reasonable grounds test.

## CONCLUSION

We hold that Ordinance 126081's prohibition on the accrual of interest on unpaid rent is preempted under state law and is therefore invalid. The trial court's preliminary injunction shall remain in effect until such time as the trial court resolves any outstanding factual or legal issues or rules otherwise. We further hold that the defense to eviction contained in SMC 22.205.090 (Ordinance 126075) deprives the landlords of their property interest without due process by not affording them the opportunity to test the veracity of a tenant's self-certification of

No. 82469-4-I/38

financial hardship.  We invalidate it on that ground only.  We otherwise uphold the

ordinances and affirm the judgment for the City.

_Andrus, C.J._

WE CONCUR:

No. 82469-4-I/38

- 38 -